In re NewBridge Bancorp S'holder Litig., 2016 NCBC 87.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

IN RE NEWBRIDGE BANCORP
SHAREHOLDER LITIGATION

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 9251 (Master File)
15 CVS 10097
15 CVS 10047

**ORDER AND FINAL JUDGMENT ON
PLAINTIFFS' MOTION FOR FINAL
APPROVAL OF SETTLEMENT AND
PLAINTIFFS' MOTION FOR APPROVAL
OF ATTORNEYS' FEES AND EXPENSES**

1. **THIS MATTER** is before the Court on Plaintiffs' Motion for Final Approval of Settlement ("Motion for Settlement Approval") and Plaintiffs' Motion for Award of Attorneys' Fees and Expenses ("Motion for Attorneys' Fees") (together, the "Motions"), each filed with supporting briefs on September 21, 2016, and arising from the Stipulation and Agreement of Compromise, Settlement and Release, dated June 14, 2016 (together with the exhibits thereto, the "Stipulation"), and the settlement contemplated thereby (the "Settlement"), which was preliminarily approved, subject to final fairness review, by this Court on June 23, 2016 in its Order Preliminarily Approving Settlement and Certifying Class and Scheduling Order and Notice of Hearing ("Preliminary Approval Order").

2. The Motion for Settlement Approval contemplates a "disclosure-based" settlement of several class actions brought to challenge a merger between two North Carolina-based banking entities. The Motion for Attorneys' Fees seeks an award of attorneys' fees for Plaintiffs' counsel's efforts in securing these additional disclosures prior to the shareholder vote on the proposed merger. The proposed Settlement does not contemplate any monetary relief to members of the purported class.

3.    Appropriate notice to potential class members (as defined herein, the "Class") following the Court's preliminary approval of the Settlement was sent, and no objection to the Settlement has been made.  The Court held a final fairness hearing, at which it questioned Plaintiffs' counsel.

4.    The Court notes that the North Carolina Business Court has historically been guided in its consideration of motions to approve, and award attorneys' fees in connection with, "disclosure-based" settlements of merger-based class action litigation by the body of persuasive case law developed by the Delaware courts over a period of many years.  The Court is also aware that the Delaware courts have recently subjected such motions to much more exacting scrutiny than they have in the past. *See, e.g.*, *In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 886 (Del. Ch. 2016).

5.    In the absence of contrary instructions from the North Carolina appellate courts, the Court finds the recent trend in the Delaware case law requiring enhanced scrutiny of disclosure-based settlements to merit careful consideration for potential application in this State.  The Court recognizes, however, that the application of Delaware's recent case law to the Motions would represent a marked departure from this Court's past practices in connection with the consideration of such motions.  As a result, the Court declines to apply enhanced scrutiny to its consideration of the Motions in this case but expressly advises the practicing bar that judges of the North Carolina Business Court, including the undersigned, may be prepared to apply enhanced scrutiny of the sort exercised in *Trulia* to the approval of disclosure-based settlements and attendant motions for attorneys' fees hereafter.

6.      Based on the analysis described below, the Court is satisfied as to the fairness, reasonableness, and adequacy of the Settlement and concludes that an award of attorneys' fees and expenses is warranted and that an award of $135,000 for attorneys' fees and $25,462.88 for expenses is fair and reasonable and consistent with Rule 1.5 of the Revised Rules of Professional Conduct of the North Carolina State Bar.

7.      For the reasons set forth herein, the Court **GRANTS** the Motion for Settlement Approval and **APPROVES** the Settlement, **CERTIFIES** the Class as defined below for purposes of the Settlement only, **GRANTS in part** the Motion for Attorneys' Fees, **AWARDS** requested attorneys' fees in the amount of $135,000 and costs in the amount of $25,462.88, and **ENTERS FINAL JUDGMENT** (hereafter, "Order and Final Judgment").

> *Rabon Law Firm, PLLC, by Gary W. Jackson, Pinto Coates Kyre & Bowers PLLC, by Paul D. Coates and Jon Ward, Rigrodsky & Long, P.A., by Brian D. Long and Gina M. Serra, Levi & Korsinsky LLP, by Donald J. Enright and Elizabeth Tripodi, Kahn Swick & Foti, LLC, by Michael J. Palestina, for Plaintiffs Paul Parshall, William Schult, and Curtis D. Nall.*

> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Reid L. Phillips, Justin Outling, and Jessica Thaller-Moran, for Nominal Defendant NewBridge Bancorp.*

> *Shanahan Law Group, PLLC, by Kieran J. Shanahan, Brandon S. Neuman, and Jeffrey M. Kelley, and Skadden, Arps, Slate, Meagher & Flom LLP, by Paul J. Lockwood and Joseph O. Larkin, for Defendants Yadkin Financial Corp. and Navy Merger Sub Corp.*

> *Robinson, Bradshaw & Hinson, by Thomas P. Holderness and Adam K. Doerr, for Defendants Michael S. Albert, Robert A. Boyette, J. David Branch, C. Arnold Britt, Robert C. Clark, Alex A. Diffey, Jr., Barry Z. Dodson, Donald P. Johnson, Joseph H. Kinnarney, Michael S. Patterson,*

*Pressley A. Ridgill, Mary E. Rittling, E. Reid Teague, Richard A. Urquhart, III, G. Alfred Webster, Kenan C. Wright, and Julius S. Young, Jr.*

Bledsoe, Judge.

## I.

## NATURE OF THE DISPUTE

8.     Plaintiffs Paul Parshall ("Parshall"), William Schult ("Schult"), and Curtis D. Nall ("Nall") (collectively, "Plaintiffs," and each a "Plaintiff") are former shareholders of NewBridge Bancorp ("NewBridge").

9.     On October 12, 2015, NewBridge entered into an Agreement and Plan of Merger ("Merger Agreement") with Navy Merger Sub Corp. ("Merger Sub"), a North Carolina corporation and a wholly owned subsidiary of Yadkin Financial Corporation ("Yadkin Financial"), which was formed solely to facilitate the merger with NewBridge (Merger Sub and Yadkin Financial, collectively, "Yadkin").

10.     NewBridge announced the Merger Agreement on October 13, 2015.  The Merger Agreement provided for the acquisition of all outstanding shares of NewBridge stock by Yadkin.  Under the Merger Agreement, NewBridge shareholders were to receive .50 shares of Yadkin common stock for each NewBridge common share they owned ("Proposed Transaction").  The closing price on the New York Stock Exchange on October 12, 2015, the last trading day before public announcement of the merger, was $22.79 for Yadkin's common stock and $8.87 for NewBridge's

common stock, yielding $11.40 in value for each share of NewBridge common stock at the 0.50 exchange ratio.[1]

11. The Merger Agreement grew out of discussions that had begun in June 2015. On August 10, 2015, NewBridge engaged Sandler O'Neill & Partners L.P. ("Sandler O'Neill") as its financial advisor in connection with the NewBridge Board of Directors' ("NewBridge Board") consideration of potential combinations, including a potential combination with Yadkin.

12. Parshall sent a demand to the NewBridge Board on October 21, 2015 and filed a complaint challenging the proposed merger on October 29, 2015. Shortly thereafter, on November 23, 2015, Schult sent a demand letter to the NewBridge Board, and, on December 10, 2015, Nall sent a demand letter to the NewBridge Board. Nall filed a complaint on December 11, 2015, and Schult filed a complaint on December 15, 2015 ("Schult Verified Complaint"). The NewBridge Board authorized a Special Committee of Independent Directors ("Special Litigation Committee") to review and investigate the demands of Parshall, Schult, and Nall.

13. NewBridge filed a Form S-4 Registration Statement with the Securities and Exchange Commission ("SEC") for the Proposed Transaction on November 17, 2015. NewBridge filed Amendment No. 1 to Form S-4 with the SEC on December 16, 2015 and Amendment No. 2 to Form S-4 on January 11, 2016.

---

[1] The closing price on January 8, 2016, the last practicable trading day before the printing of the Final Proxy Statement, was $24.42 for Yadkin's common stock and $11.27 for NewBridge's common stock, yielding $12.21 in value for each share of NewBridge common stock at the 0.50 exchange ratio.

14. Each of the three actions filed by Plaintiffs was designated as a mandatory complex business case and assigned to this Court. On January 11, 2016, the Court entered an order consolidating the three actions, captioning the consolidated cases as *In re NewBridge Bancorp Shareholder Litigation*, Case No. 15-CVS-9251 (Master File); 15-CVS-10097, 15-CVS-10047 (the "Consolidated Action"), and designating the Schult Verified Complaint as the operative complaint in the Consolidated Action ("January 11, 2016 Order"). In the January 11, 2016 Order, the Court also appointed Plaintiffs' Co-Lead Counsel and Co-Liaison Counsel, as defined herein, each having extensive, well-documented experience and success in this type of litigation.

15. The Schult Verified Complaint asserted claims on behalf of the public stockholders of NewBridge or, alternatively, derivatively on behalf of NewBridge, against Yadkin, Merger Sub, the individual members of the NewBridge Board of Directors, which included Michael S. Albert, Robert A. Boyette, J. David Branch, C. Arnold Britt, Robert C. Clark, Alex A. Diffey, Jr., Barry Z. Dodson, Donald P. Johnson, Joseph H. Kinnarney, Michael S. Patterson, Pressley A. Ridgill, Mary E. Rittling, E. Reid Teague, Richard A. Urquhart, III, G. Alfred Webster, Kenan C. Wright, and Julius S. Young, Jr. (collectively, the "NewBridge Directors"), and NewBridge as nominal Defendant (together "Defendants" and each a "Defendant"). The Schult Verified Complaint alleged that the NewBridge Directors had breached their fiduciary duties by proposing a transaction that undervalued NewBridge, by agreeing to unreasonable deal protection provisions, and by causing NewBridge to issue materially incomplete and misleading disclosures, and further that Yadkin and

Merger Sub aided and abetted the NewBridge Directors' breach of their fiduciary duties.

16. NewBridge filed its Final Proxy Statement on January 13, 2016 ("Proxy").

17. On January 15, 2016, the Court held a telephone status conference with counsel for the parties to discuss scheduling deadlines for potential motions in this action. Thereafter, the Court entered a scheduling order setting forth briefing deadlines and a hearing date for Plaintiffs' potential motions for expedited discovery and for preliminary injunction.

18. On January 21, 2016, Plaintiffs filed a Motion to Expedite Discovery. Plaintiffs subsequently withdrew their Motion to Expedite Discovery on January 25, 2016 because NewBridge agreed to provide discovery to Plaintiffs on an expedited basis in advance of a then-contemplated preliminary injunction hearing. Plaintiffs thereafter engaged in expedited document review with Defendants' consent and deposed Michael S. Albert, the Chairman of the NewBridge Board, on January 28, 2016, and Scott Clark, a partner at Sandler O'Neill, on February 2, 2016.

19. On February 5, 2016, the Plaintiffs and Defendants entered into a Memorandum of Understanding ("MOU"), memorializing their agreement to resolve all claims in the litigation, subject to confirmatory discovery. Pursuant to the MOU, NewBridge filed a Form 8-K that same day ("8-K"), reporting that NewBridge agreed to make "certain supplemental disclosures related to the proposed merger" as set forth in the 8-K as part of the proposed Settlement ("Supplemental Disclosures"). (8-K 2.) The 8-K also informed shareholders that (i) "[i]f the [Settlement] is finally

approved by the Court, the parties anticipate that it will resolve and release all claims pursuant to the terms that will be disclosed to NewBridge shareholders prior to final approval of the [S]ettlement" and (ii) "the parties contemplate that plaintiffs' counsel . . . will file a petition in the Court for approval of attorneys' fees and expenses to be paid by NewBridge or its successor." (8-K 2.)

20. The Supplemental Disclosures contained "information relating to potential conflicts of interest" and "information relating to Sandler O'Neill's valuation analyses that were performed, and reviewed by the NewBridge Board, to support the fairness of the Merger considerations." (Pls.' Mem. Supp. Settlement Approval 13, 16.) Specifically, the Supplemental Disclosures informed shareholders of the following:

- That a new employment agreement for Pressly A. Ridgill ("Ridgill"), NewBridge's President, CEO, and director, had been presented to Yadkin by Sandler O'Neill in late July 2015 (8-K 3);

- That NewBridge Board's discussions with Yadkin subsequently included negotiations regarding Ridgill's role in the combined company (8-K 3);

- That Yadkin's Revised Letter of Intent proposed retaining Ridgill with an annual compensation of $1,000,000 and a severance of 2.99x annual compensation in connection with a change-in-control of Yadkin (8-K 3);

- Sandler O'Neill's specific prior representation of NewBridge—"an acquisition of Premier Commercial Bank, which closed . . . on February 27, 2015" (8-K 8);

- The specific advisory fee received by Sandler O'Neill from VantageSouth Bancshares, Inc. in connection with its sale to Yadkin—$1,564,119 (8-K 8);

- That Yadkin's Letter of Intent on August 26, 2015 specified the proposed number of NewBridge directors to serve on the board of the combined company (8-K 3);

- That Yadkin increased the proposed number of NewBridge directors in its Revised Letter of Intent on September 4, 2015 from four to five after negotiations with the NewBridge Board (8-K 3);

- The contribution analysis performed by Sandler O'Neill and reviewed by the NewBridge Board to support the fairness of the Merger considerations (Form 8-K 4); and

- The individual metrics for the selected NewBridge peer public companies, the selected Yadkin peer public companies, the selected regional merger transactions, and the selected nationwide merger transactions analyzed by Sandler O'Neill in its comparable company and comparable transaction analyses in the Proxy (8-K 5–8).

21. The parties advised the Court of their agreement to the MOU on February 5, 2016. Subsequently, on February 8, 2016, the Court stayed all proceedings and ordered the parties to complete confirmatory discovery and submit a motion for preliminary approval of the proposed settlement, or a joint status report, no later than April 8, 2016.

22. The NewBridge shareholder vote was held as scheduled on February 23, 2016, at which 26,534,461 Class A common stock shares voted in favor of the merger,

226,186 shares voted against, and 261,078 shares abstained. All 1,723,000 Class B common stock shares voted in favor of the merger.

23. The merger transaction was consummated on March 1, 2016, and NewBridge was merged out of existence that day.

24. On March 27, 2016, the parties completed confirmatory discovery.

25. On April 8, 2016, the parties filed a joint status report, requesting that the stay of proceedings be continued and that the parties be permitted an additional twenty-three days to finalize and file both the settlement papers and Plaintiffs' motion for preliminary approval of the proposed settlement. The Court subsequently entered a scheduling order continuing the stay and ordering Plaintiffs to file a motion for preliminary approval of the proposed settlement, or a joint status report, no later than June 15, 2016.

26. The parties executed the Stipulation embodying the Settlement on June 14, 2016. Plaintiffs submitted the Stipulation with their Unopposed Motion for Preliminary Approval of the Settlement, Certification of Settlement Class, Approval of Class Notice and Final Approval Hearing Scheduling on June 15, 2016. Plaintiffs also submitted for approval and distribution a proposed Notice of Pendency of Class Action, Class Action Determination, Proposed Settlement of Class Action, Settlement Hearing and Right to Appear (the "Notice").

27. The Court issued its Preliminary Approval Order on June 23, 2016, which approved the content and form of the Notice and directed that the Notice be mailed to all shareholders of record who were members of the Class at their last known

address, and which also set the fairness hearing for October 12, 2016 ("Settlement Hearing").

28. Yadkin, as successor in interest to NewBridge, engaged Garden City Group, LLC ("GCG") as an agent to undertake the mailing of the Notice as directed by the Court. The Notice informed shareholders (i) of the specific terms of the Settlement, including the Supplemental Disclosures obtained by the Class in the Settlement and the specific terms of the release of Released Claims (as defined below) given by the Class in exchange for the Supplemental Disclosures, (ii) that as Class Members, the shareholders would "be bound by any judgment in the Consolidated Action" and could not "opt-out of the Class," and (iii) that the shareholders could object to the Settlement and Plaintiffs' counsel's application for attorneys' fees as specifically provided in the Notice.

29. As of October 7, 2016, GCG had mailed the Notice to 11,779 NewBridge stockholders of record and beneficial owners who held NewBridge common stock at any time during the Class Period (as defined herein).

30. The Court held the Settlement Hearing on October 12, 2016. Neither the Court, the parties, nor GCG received any objection to the Settlement, either before, during, or after the Settlement Hearing. In addition, Plaintiffs' counsel advised at the Settlement Hearing that Plaintiffs had reviewed a thorough investigative report prepared by the Special Litigation Committee (the "Report"), which supported Plaintiffs' counsel's own conclusion that, after reasonable investigation, neither the claims asserted in the Consolidated Action nor the claims not asserted but released

in the Settlement had substantial merit and that further litigation of Plaintiffs' claims was not reasonably justified.

## II.

## CLASS CERTIFICATION AND THE SETTLEMENT

31. This Court has broad discretion in determining whether a case should continue as a class action. *In re Harris Teeter Merger Litig.*, 2014 NCBC LEXIS 47, at *8 (N.C. Super. Ct. Sept. 24, 2014) (approving final settlement); *Harrison v. Wal-Mart Stores, Inc.*, 170 N.C. App. 545, 547, 613 S.E.2d 322, 325 (2005) (citing *Faulkenbury v. Teachers' and State Employees' Ret. Sys. of N.C.*, 345 N.C. 683, 699, 483 S.E.2d 422, 432 (1997)).

32. Class certification is controlled by North Carolina Rule of Civil Procedure 23 ("North Carolina Rule(s)"), and our courts have provided that a trial court, in its discretion, may certify a class action where the following requirements are met:

> (1) the existence of a class, (2) . . . the named representative will fairly and adequately represent the interests of all class members, (3) . . . there is no conflict of interest between the representative and class members, (4) . . . class members outside the jurisdiction will be adequately represented, (5) . . . the named party has a genuine personal interest in the outcome of the litigation, (6) . . . class members are so numerous that it is impractical to bring them all before the court, (7) . . . adequate notice of the class action is given to class members.

*In re PokerTek Merger Litig.*, 2015 NCBC LEXIS 10, at *9–10 (N.C. Super. Ct. Jan. 22, 2015) (quotations and citations omitted).

33. Further, the North Carolina Supreme Court has held that "a 'class' exists . . . when the named and unnamed members each have an interest in either the same

issue of law or of fact, and that issue predominates over issues affecting only individual class members." *Crow v. Citicorp Acceptance Co.*, 319 N.C. 274, 280, 354 S.E.2d 459, 464 (1987).

34. In addition, our courts have observed that "[s]ettlement has long been preferred to litigation, and public policy prefers upholding good faith settlements, even without strong regard to the consideration underlying the settlement." *In re Progress Energy S'holder Litig.*, 2011 NCBC LEXIS 45, at *17 (N.C. Super Ct. Nov. 29, 2011); *see generally In re Harris Teeter Merger Litig.*, 2014 NCBC LEXIS 47, at *12; *Ehrenhaus v. Baker*, 216 N.C. App. 59, 72, 717 S.E.2d 9, 19 (2011) ("*Ehrenhaus I*") (citing *Knight Publ'g Co. v. Chase Manhattan Bank, N.A.*, 131 N.C. App. 257, 262, 506 S.E.2d 728, 731 (1988)).

35. However, "due to the unique due process concerns" of a class action settlement, which binds individuals not before the court to the settlement, "parties cannot settle a class action without court approval." *Ehrenhaus I*, 216 N.C. at 72, 717 S.E.2d at 19. Our courts have observed that court approval of a class action settlement is intended to:

> (1) assure[] that any person whose rights would be affected by settlement has the opportunity to support or oppose it; (2) prevent[] private arrangements that may constitute "sweetheart deals" contrary to the best interests of the class; (3) protect[] the rights of those whose interests may not have been given due regard by the negotiating parties; and finally, (4) assure[] each member of the class that his or her integrity and right to express views and be heard on matters of vital personal interest has not been violated by others who have arrogated to themselves the power to speak and bind without consultation and consent.

*Id.* (citing *In re Agent Orange, Prod. Liab. Litig.*, 597 F. Supp. 740, 748 (E.D.N.Y. 1984), *aff'd sub nom.*, *In re Agent Orange Prod. Liab. Litig.* MDL No. 381, 818 F.2d 145 (2d Cir. 1987)).

36. Here, consistent with the Preliminary Approval Order, the Stipulation embodying the Settlement was presented at the Settlement Hearing on October 12, 2016. The Stipulation was entered into by Plaintiffs Parshall, Schult, and Nall, and Defendants Yadkin, Merger Sub, the NewBridge Directors, and NewBridge as nominal defendant, through their counsel in the Consolidated Action, and executed on June 14, 2016. The executed Stipulation was filed as Exhibit 1 to Plaintiffs' Motion for Settlement Approval and was fully, fairly, and adequately described in the Notice.

37. **NOW THEREFORE**, the Court, having determined that Notice of the Settlement Hearing was given to the Class (as defined below) in accordance with the Preliminary Approval Order and that the Notice was adequate and sufficient; and the parties having appeared by their attorneys of record; and the attorneys for the respective parties having been heard in support of the Settlement of the Consolidated Action; and an opportunity to be heard having been given to all other persons desiring to be heard as provided in the Notice; and the entire matter of the Settlement having been considered by the Court; **IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, this 22nd day of November, 2016, as follows:

a. The Notice has been given to the Class (as defined below) pursuant to and in the manner directed by the Preliminary Approval Order, proof of the mailing of the Notice has been filed with the Court, and a full opportunity to be heard has

been offered to all parties to the Consolidated Action, the Class, and persons in interest. The Notice adequately apprised the Class members of the terms of the Settlement and the place, date, and time of the Settlement Hearing, and the Court finds that the Notice fully, fairly, and accurately described the consideration the Class was to receive, and the claims and rights the Class agreed to release in exchange, under the terms of the Settlement. The form and manner of the Notice is hereby determined to have been the best notice practicable under the circumstances and to have been given in full compliance with due process, Rule 23 of the North Carolina Rules of Civil Procedure, and applicable law, and it is further determined that all members of the Class are bound by this Order and Final Judgment.

      b. The Court hereby finds, pursuant to Rule 23 of the North Carolina Rules of Civil Procedure, as follows:

        i. that (i) the Class, as defined below, is so numerous that joinder of all members is impracticable, (ii) there are questions of law and fact common to the Class, (iii) the claims of Plaintiffs are typical of the claims of the Class, (iv) Plaintiffs and Plaintiffs' Co-Lead Counsel and Co-Liaison Counsel have fairly and adequately protected the interests of the Class, and (v) a class action is superior to all other methods available for adjudication of the controversy before the Court;

        ii. that the requirements of North Carolina Rule 23 have been satisfied;

        iii. that the requirements of the North Carolina Rules and due process have been satisfied in connection with the Notice; and

iv. that a non-opt out class is appropriate here because the relief sought for the Class was for uniform group remedies of injunctive and declaratory relief, all of which were applicable with respect to the Class as a whole.[2]

c. Therefore, the Consolidated Action is hereby certified as a non-opt out class action pursuant to Rule 23 of the North Carolina Rule of Civil Procedure, with the Class defined as follows:

> any and all record holders and beneficial owners of common stock of NewBridge who held or owned such stock at any time during the period beginning on and including October 13, 2015 through and including March 1, 2016 (the "Class Period"), including any and all of their respective successors-in-interest, successors, predecessors-in-interest, predecessors, representatives, trustees, executors, administrators, estates, heirs, assigns and transferees, immediate and remote, and any person or entity acting for or on behalf of, or claiming under, any of them, and each of them, together with their predecessors-in-interest, predecessors, successors-in-interest, successors, and assigns (the "Class"). Excluded from the Class are Defendants and their immediate family members, any entity in which any Defendant has a controlling interest, and any successors-in-interest thereto.

d. Plaintiffs Parshall, Schult, and Nall are hereby certified as the Class representatives.

e. Rigrodsky & Long, P.A., Levi & Korsinsky LLP, and Kahn Swick & Foti, LLC are hereby appointed Co-Lead Counsel for the Class ("Co-Lead Counsel"); and Rabon Law Firm, PLLC and Pinto Coates Kyre & Bowers, PLLC are hereby appointed as Co-Liaison Counsel for the Class ("Co-Liaison Counsel").

---

[2] As set forth in the Stipulation, certification of the class is "for settlement purposes only" and "[i]n the event the Settlement does not become final for any reason, Defendants reserve the right to oppose certification of any plaintiff class in future proceedings."

f.   Courts commonly utilize at least the following factors when determining the fairness, reasonableness, and adequacy of a proposed class action settlement: (a) the strength of the plaintiff's case, (b) the defendant's ability to pay, (c) the complexity and cost of further litigation, (d) the amount of opposition to the settlement, (e) class members' reaction to the proposed settlement, (f) counsel's opinion, and (g) the stage of the proceedings and how much discovery has been completed. *See Ehrenhaus I*, 216 N.C. App. at 73–75, 717 S.E.2d at 19–20 (citations omitted).

g.   When reviewing a proposed settlement, the trial court "must protect, to the extent practicable, the rights of passive class members," *Ehrenhaus I*, 216 N.C. at 73, 717 S.E.2d at 30.  Particularly with a disclosure-based settlement, the trial court should consider and scrutinize what the class is to receive (the "get") and to give up (the "give") in the settlement.  *See Corwin v. British Am. Tobacco PLC*, 2016 NCBC LEXIS 14, at *11–12 (N.C. Super. Ct.  Feb. 17, 2016) (approving settlement after the trial court "carefully balanced the 'give' and the 'get' of the proposed [settlement]"); *In re Trulia, Inc.* 129 A.3d at 898 (noting trial court must "be increasingly vigilant in applying its independent judgment to its case-by-case assessment of the reasonableness of the "give" and "get" of [disclosure-based] settlements"); *see also Moody v. Sears, Roebuck & Co.*, 2007 NCBC LEXIS 11, at *38 (N.C. Super. Ct. 2007), *rev'd on other grounds*, 191 N.C. App. 256, 664 S.E.2d 569 (2008) (criticizing attorneys' fee award in consumer class action because of "vast disparity between what the class received and the fee accorded to class counsel").[3]

---

[3] While a balancing of the nature of the settlement consideration received by the proposed class against the scope of the release given by the proposed class is implicitly included in the

h. The Court has applied the foregoing factors to the present case and finds the Settlement to be fair, reasonable, adequate, and in the best interests of the Class, and it is hereby approved.

i. Based on its careful review of the record, the Court concludes that the Settlement resulted from arm's-length negotiations that were undertaken without collusion, Plaintiffs' claims and any claims released[4] through the Settlement were of limited or nominal value, and Plaintiffs credibly assert that Plaintiffs' counsel determined that the Settlement, which achieved the publication of the Supplemental Disclosures without monetary relief, was in the best interests of the putative class and was justified by the nature of the release offered by Plaintiffs.

j. The Court further concludes that the "give" and the "get" of the Settlement are proportionate and balanced and sufficient to support approval of the Settlement. In particular, while, as discussed below, the Supplemental Disclosures received by the Class are of limited value, the Court nonetheless concludes that the

---

*Ehrenhaus I* factors, the Court believes this specific balancing should be explicitly stated and considered as a separate factor for settlements of the type here. Consistent with paragraphs 4 and 5 above, judges of the North Carolina Business Court, including the undersigned, may apply more exacting scrutiny hereafter to the scope of a proposed release of claims as balanced against the proposed settlement consideration to be received by the class and may be prepared to reject a proposed settlement which includes a release which is significantly broader than justified by the consideration gained for the class in the settlement. *See In re Pike Shareholder Litig.*, 2015 NCBC LEXIS 95, *24 (N.C. Super. Ct. Oct. 8, 2015) (finding the "Delaware Court of Chancery's recent caution that fee requests in disclosure-only settlements may now face more searching scrutiny, particularly when accompanied by the broadest possible releases" to be a "fair [caution]").

[4] The Court relies on Plaintiffs' counsel's representation at the Settlement Hearing, supported by Defendants and not challenged or objected to by any class member, that after reasonable investigation and consideration of the Report, neither the claims asserted in the Consolidated Action nor the claims not asserted but released in the Settlement had substantial merit.

value received by the Class is commensurate to, and a fair and reasonable exchange for, the value of the claims the Class relinquished, which the Court finds are likewise of little or limited value. *See, e.g., In re PokerTek Merger Litig.*, 2015 NCBC LEXIS 10, at *14–15 (approving settlement, in part, because plaintiffs' claims were not strong enough to justify further litigation); *In re Trulia, Inc.*, 129 A.3d at 908 n.89.

k. Moreover, the Class members overwhelmingly approved the merger, and no Class member raised an objection to the Settlement after receiving notice. *See Ehrenhaus I*, 216 N.C. App. at 74, 717 S.E.2d at 20 ("[T]he reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.") (citations and quotations omitted); *see also, e.g., Prince v. Bensinger*, 244 A.2d 89, 95–96 (Del. Ch. 1968) (finding shareholder approval of transaction a factor in favor of settlement approval); *Hynson v. Drummond Coal Co.*, 601 A.2d 570, 674 (Del. Ch. 1991) (finding absence of class objections a factor in favor of settlement approval).[5]

l. Under these circumstances, the Court finds Plaintiffs' counsel's decision to settle the case for publication of the Supplemental Disclosures without monetary recovery in exchange for the release provided to be prudent and reasonable. In particular, the Court concludes that Plaintiffs' counsel reasonably assessed the strength of Plaintiffs' claims in considering whether the bargained-for Supplemental

---

[5] While the Court is concerned that the breadth of the release in this proposed settlement may be excessive for the consideration received by the class, the Court is reluctant to set aside the settlement in light of the approval of prior similar settlements by the Business Court and the fact that the Court did not receive any objections to the proposed settlement from any class member or other objector after full notice.

Disclosures were adequate consideration for the Settlement and the Release offered therein.

m. The Parties are hereby authorized and directed to comply with and to consummate the Settlement in accordance with its terms and provisions, and the Clerk is directed to enter and docket this Order and Final Judgment in the Consolidated Action, and the actions that comprise the Consolidated Action.

n. This Order and Final Judgment shall not constitute any evidence or admission by any of the parties herein that any acts of wrongdoing have been committed by any of the parties to the Consolidated Action (or the actions that comprise the Consolidated Action) and should not be deemed to create any inference that there is any liability therefor.

o. The Consolidated Action and the actions that comprise the Consolidated Action are hereby dismissed with prejudice in their entirety on the merits, without fees, costs and expenses beyond those approved herein.

p. This Order and Final Judgment provides for the full and complete discharge, dismissal with prejudice, settlement and release of, and a permanent injunction barring, any and all manner of claims, demands, rights, liabilities, losses, obligations, duties, costs, debts, expenses, interest, penalties, sanctions, fees, attorneys' fees, actions, potential actions, causes of action, suits, agreements, judgments, decrees, matters, issues and controversies of any kind, nature or description whatsoever, disclosed or undisclosed, accrued or unaccrued, apparent or not apparent, foreseen or unforeseen, matured or not matured, suspected or

unsuspected, liquidated or not liquidated, fixed or contingent, that Plaintiffs or any or all other members of the Class ever had, now have, or may have, whether direct, derivative, individual, class, representative, legal, equitable or of any other type, or in any other capacity, based on his, her, or its ownership of NewBridge common stock during the Class Period, against any of the Released Parties (as defined below), whether based on state, local, foreign, federal, statutory, regulatory, common or other law or rule (including, but not limited to, any claims under federal securities laws or state disclosure law or any claims that could be asserted derivatively on behalf of NewBridge), which, now or hereafter, are based upon, arise out of, relate in any way to, or involve, directly or indirectly, any of the actions, transactions, occurrences, statements, representations, misrepresentations, omissions, allegations, facts, practices, events, claims or any other matters, things or causes whatsoever, or any series thereof, that were or could have been alleged, asserted, set forth, claimed, embraced, involved, or referred to in, or related to, directly or indirectly, the Consolidated Action, or the subject matter thereof, in any court, tribunal, forum or proceeding, including, without limitation, any and all claims that are based upon, arise out of, relate in any way to, or involve, directly or indirectly, (i) the Proposed Transaction, the NewBridge/Yadkin merger, or the Merger Agreement (or any amendment thereto); (ii) any deliberations or negotiations in connection with the Proposed Transaction, the NewBridge/Yadkin merger, or the Merger Agreement (or any amendments thereto), including the process of deliberation or negotiation by Defendants, and any of their respective officers, directors, principals, partners or

advisors; (iii) the consideration to be received by Class members in connection with the Proposed Transaction or the NewBridge/Yadkin merger; (iv) the consideration to be received by any other person in connection with the Proposed Transaction or the NewBridge/Yadkin merger (including, but not limited to, any NewBridge or Yadkin agreement); (v) the Form S-4 (including any amendments) or any other disclosures or statements relating to the Proposed Transaction or the NewBridge/Yadkin merger, including, without limitation, claims under the federal securities laws within the exclusive jurisdiction of the federal courts; (vi) the statutory or fiduciary obligations, if any, of the Released Parties (as defined below) in connection with the Proposed Transaction or the NewBridge/Yadkin merger; or (vii) any of the allegations in any complaint or amendment(s) thereto filed in the Consolidated Action (collectively, the "Released Claims"); provided, however, for the avoidance of doubt, the Released Claims shall not include (i) the right to enforce the Stipulation or the Settlement or the rights of any member of the Class to seek appraisal of their NewBridge shares pursuant to N.C. Gen. Stat. § 55-13-02, or (ii) claims that do not in any respect arise out of, or do not relate in any manner to, the Proposed Transaction and the NewBridge/Yadkin merger (including the negotiations in connection with the Proposed Transaction and the NewBridge/Yadkin merger) that are (1) unknown to Plaintiffs and their counsel; (2) brought under the Securities Act of 1933 or Sections 10 or 14 of the Securities Exchange Act of 1934 and (3) are based on any alleged

material misstatements or omissions in the historical financial statements of Yadkin included in the Form S-4 (including any amendments).[6]

q. Defendants release Plaintiffs and Plaintiffs' counsel from all claims, complaints, petitions, liabilities, or sanctions arising out of the investigation, commencement, prosecution, settlement, or resolution of their respective actions, and shall be barred from asserting same; provided, however, that such releases will not include a release of the right to enforce the Stipulation or the Settlement.

r. Whether or not each or all of the following persons or entities were named, served with process, or appeared in the Consolidated Action, "Released Parties" means Yadkin Financial Corporation, Navy Merger Sub Corp., Michael S. Albert, Robert A. Boyette, J. David Branch, C. Arnold Britt, Robert C. Clark, Alex A. Diffey, Jr., Barry Z. Dodson, Donald P. Johnson, Joseph H. Kinnarney, Michael S. Patterson, Pressley A. Ridgill, Mary E. Rittling, E. Reid Teague, Richard A. Urquhart, III, G. Alfred Webster, Kenan C. Wright, Julius S. Young, Jr., and NewBridge Bancorp, and each of their respective past or present family members, spouses, heirs, trusts, trustees, executors, estates, administrators, beneficiaries, distributees, foundations, agents, employees, fiduciaries, partners, control persons, partnerships, general or limited partners or partnerships, joint ventures, member firms, limited liability companies, corporations, parents, subsidiaries, divisions, affiliates, associated entities, shareholders, principals, officers, managers, directors,

---

[6] The Court expresses no opinion as to whether the release, as drafted, could be interpreted to extend its reach to claims NewBridge stockholders might have based on conduct arising prior to, and without any relation to, the negotiation and consummation of the merger transaction which is the subject of this litigation.

managing directors, members, managing members, managing agents, predecessors, predecessors-in-interest, successors, successors-in-interest, assigns, financial or investment advisors, advisors, consultants, investment bankers, entities providing any fairness opinion, underwriters, brokers, dealers, lenders, commercial bankers, attorneys, personal or legal representatives, accountants, insurers, co-insurers, reinsurers, and associates, of each and all of the foregoing.

s. Any party providing a release (a "Releasing Person") waives and relinquishes, to the fullest extent permitted by law, the provisions, rights and benefits of any state, federal, or foreign law or principle of common law, which may have the effect of limiting the releases set forth above. Plaintiffs acknowledge, and the members of the Class shall be deemed by operation of the entry of this Order and Final Judgment approving the Settlement to have acknowledged, that the foregoing waiver was separately bargained for, is an integral element of the Settlement, and was relied upon by each and all of the Defendants in entering into the Settlement.

t. The fact of and provisions contained in the Stipulation, and all negotiations, discussions, actions, and proceedings in connection with the Stipulation shall not be deemed or constitute a presumption, concession or an admission by any party in the Consolidated Action, any signatory thereof or any Released Parties of any fault, liability, or wrongdoing or lack of any fault, liability, or wrongdoing, as to any facts or claims alleged or asserted in the Consolidated Action, or any other actions or proceedings, and shall not be interpreted, construed, deemed, involved, invoked, offered, or received in evidence or otherwise used by any person in the Consolidated

Action or any other action or proceeding, whether civil, criminal, or administrative, except in connection with any proceeding to enforce the terms of the Stipulation. The Released Parties may file the Stipulation and/or this Order and Final Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good-faith settlement, judgment bar or reduction or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

u. In the event that the Settlement does not become effective in accordance with the terms of the Stipulation, this Order and Final Judgment shall be rendered null and void to the extent provided by, and in accordance with, the Stipulation and shall be vacated and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Stipulation.

v. Without affecting the finality of this Final Order in any way, this Court hereby retains continuing jurisdiction over all parties to the Stipulation and the Settlement for the purpose of construing, enforcing and administering the Stipulation, the Settlement, and this Order and Final Judgment.

## III.

## PLAINTIFFS' REQUEST FOR ATTORNEYS' FEES

38. Paragraph IX of the Notice provided specific notice to the Class that "Plaintiffs and Plaintiffs' counsel will petition the Court to approve the amount of attorneys' fees, costs and expenses, which amount shall be wholly inclusive of all fees,

expenses, cost disbursements, and expert and consulting fees in the Consolidated Action (including each of the lawsuits that comprises the Consolidated Action)" and further that the requested amount "shall not exceed $300,000 in total," that "Defendants and their counsel will not object" to Plaintiffs' fee petition within this maximum requested amount, and that "NewBridge or its successor-in-interest" shall pay the fees and expenses awarded by the Court.

39.    Plaintiffs subsequently filed their Motion for Attorneys' Fees and now request the Court to approve the provision in the Stipulation by which NewBridge agreed to pay up to $300,000 ("Fee Payment") to reimburse Plaintiffs' costs and expenses and pay Plaintiffs' attorneys' fees. (Pls.' Mem. Supp. Mot. App. Att'y Fees 1.)  The requested amount includes $25,462.88 in out-of-pocket expenses and up to $274,537.12 in attorneys' fees. (Pls.' Mem. Supp. Mot. App. Att'y Fees 1, 4–5.)  The Settlement is not conditioned on the approval of the Fee Payment, but the Fee Payment is conditioned on Court approval. (Pls.' Mem. Supp. Mot. App. Att'y Fees 3–4.) (Pls.' Mem. Supp. Settlement Approval, Ex. 1, Stipulation and Agreement of Compromise, Settlement and Release ¶ 13.)  If otherwise approved by the Court, the Settlement becomes final whether or not the Fee Payment is made.

40.    No member of the Class has filed an objection to Plaintiffs' request for attorneys' fees and reimbursement of costs and expenses—either in response to the Notice or in response to Plaintiffs' subsequent Motion for Attorneys' Fees.  No member of the Class appeared at the Settlement Hearing in opposition to Plaintiffs' Motion for Attorneys' Fees.

41.     The North Carolina Court of Appeals has held that "the parties to a class action may agree to a fee-shifting provision in a negotiated settlement that is — like all other aspects of the settlement — subject to the trial court's approval in a fairness hearing." *Ehrenhaus v. Baker*, 776 S.E.2d 699, 708 (N.C. Ct. App. Mar. 19, 2015) ("*Ehrenhaus II*").[7]     Here, the parties expressly agreed in paragraph 13 of the Stipulation that "NewBridge or its successor(s)-in-interest" would pay an amount "not to exceed $300,000 in total" to Plaintiffs' counsel for their attorneys' fees, costs, and expenses, subject to the Court's final approval.  Thus, the Court finds that the Stipulation establishes a contractual basis for the Court's authority to make an award of fees and expenses to Plaintiffs' counsel in an amount that is fair and reasonable. *Ehrenhaus II*, 776 S.E.2d at 708; *see also Corwin,* 2016 NCBC LEXIS 14, at *8.

42.     Once the trial court has determined it has the authority to award a fee, "the trial court must carefully assess the award of attorneys' fees to ensure that it is fair and reasonable." *Ehrenhaus II*, 776 S.E.2d at 708 (citing *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011)).   In fulfilling this important responsibility, the trial court must assess the materiality and value of the disclosures obtained against the amount of attorneys' fees requested.  The Delaware courts have recently noted that the trial court's assessment typically occurs, as it does here, without the benefit of an adversarial process. *See generally In re Trulia, Inc.*, 129 A.3d at 894 ("The lack of an adversarial process [in a disclosure only settlement] often

[7] *Ehrenhaus II* was not appealed, and the North Carolina Supreme Court has not otherwise addressed whether North Carolina's strict adherence to the American Rule bars or permits parties from contracting for an award of attorneys' fees to settle class action litigation in the absence of express statutory authority.

requires that the Court become essentially a forensic examiner of proxy materials so that it can play devil's advocate in probing the value of the "get" for stockholders in a proposed disclosure settlement.").

43. Our appellate courts have determined that Rule 1.5 of the Revised Rules of Professional Conduct of the North Carolina State Bar sets forth the factors a trial court should evaluate in determining the reasonableness of the attorneys' fees requested in a negotiated settlement to a class action. *Ehrenhaus I*, 216 N.C. App. at 96, 717 S.E.2d at 33.

44. N.C. Rev. R. Prof. Conduct 1.5. (a) specifically provides as follows:

A lawyer shall not make an agreement for, charge, or collect an illegal or clearly excessive fee or charge or collect a clearly excessive amount for expenses. The factors to be considered in determining whether a fee is clearly excessive include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

45. The evidence of record shows that Plaintiffs' counsel devoted 523.25 hours to the prosecution of Plaintiffs' claims, not including time associated with the Settlement Hearing. Among the tasks performed, Plaintiffs' counsel conducted two half-day depositions, one of Michael S. Albert, the Chairman of the NewBridge Board, and the other of Scott Clark, a partner at Sandler O'Neill, NewBridge's investment advisor. Plaintiffs' counsel also reviewed 1,400 non-public documents that were central to the claims asserted, and retained and consulted with a financial expert.

Plaintiffs' counsel also avoided unnecessary duplication of effort by selecting co-lead and co-liaison counsel early in the case. (Pls.' Mem. Supp. Settlement Approval 3–4, 12.) Based on the above, the Court concludes that the time expended by Plaintiffs' counsel was reasonable in light of the complex nature of this litigation.[8] *See* N.C. Rev. R. Prof. Conduct 1.5(a)(1).

46. In addition, the nature of the claims required highly skilled litigation counsel that were experienced in shareholder class actions, and the Court finds that Plaintiffs' counsel are highly-regarded, highly-experienced class action counsel that have been involved in a number of significant class action matters including matters resulting in substantial monetary recovery for the class. *See* N.C. Rev. R. Prof. Conduct 1.5(a)(1) and (7). Accordingly, the Rule 1.5(a)(1) and Rule 1.5(a)(7) factors weigh in favor of the Fee Payment.

47. Although the acceptance of the particular employment required Plaintiffs' counsel to expend a fairly significant number of hours in a relatively short period of time, the time required to prosecute this matter was decreased by Plaintiffs' counsel's receipt and use of the Report prepared by NewBridge's Special Litigation Committee

---

[8] Co-Lead Counsel and Co-Liaison Counsel submitted summary charts setting forth totals for "Categorized Hours" and "Lodestar from Inception through September 20, 2016" and listing the total number of hours spent by each attorney in each of nine separate task-based categories. The Court notes that attorneys' fees' petitions in this Court are typically supported by detailed attorney time records and advises that the Court will be reluctant to approve future petitions for attorneys' fees lacking such evidentiary support. *See e.g.,* Fifth Application for Compensation and Reimbursement of Expenses of Receiver, *In re Southeastern Eye Center – Pending Matters,* No. 12 CVS 1648 (N.C. Super. Ct. Aug. 31, 2016); Supplemental Affidavit of David S. Pokela in Support of Defendant Jeffrey L. Bostic's Motion for Attorney Fees and Cost, *Am. Mech., Inc. v. Bostic,* No. 12 CVS 1384 (N.C. Super. Ct. May 18, 2016).

that was formed to evaluate Plaintiffs' derivative demands. In addition, nothing in the record suggests that the nature of this engagement precluded Plaintiffs' counsel from taking on other work during the brief period of this engagement. *See* N.C. Rev. R. Prof. Conduct 1.5(a)(2) and (5). These considerations cause the Rule 1.5(a)(2) and Rule 1.5(a)(5) factors to not weigh heavily in favor of the Fee Payment.

48.    The Court further finds that Plaintiffs' counsel accepted engagement in the litigation pursuant to a written contingency-fee agreement, advanced expenses of the litigation, worked diligently under a compressed time schedule, and undertook the representation with no assurance of payment. *See* N.C. Rev. R. Prof. Conduct 1.5(a)(8). The Rule 1.5(a)(8) factor weighs in favor of the Fee Payment.

49.    A weighing of the factors set forth in Rule 1.5(a)(3), concerning the fee customarily charged in the locality for similar legal services, and Rule 1.5(a)(4), concerning the amount involved and the results obtained, is not clear cut and requires further discussion.

50.    As to N.C. Rev. R. Prof. Conduct 1.5(a)(3), the Court notes that several of Plaintiffs' counsel, including Court-approved Co-Lead Counsel, practice outside North Carolina, including in Washington, D.C. and Delaware. This Court has previously observed that "[a]ttorneys' fees for similar work in [Washington, D.C. and New York City] is substantially higher than the typical range in North Carolina." *In re PokerTek Merger Litig.*, 2015 NCBC LEXIS 10, at *59. It is the Court's experience that the fees charged for this sort of litigation by skilled Delaware attorneys is similar to the fees charged by skilled counsel for similar work in New York City and

Washington, D.C. Indeed, Plaintiffs have offered evidence that the rates charged by the senior lawyers for all three of Plaintiffs' Court-approved Co-Lead Counsel in this litigation range from $650–$850 per hour. Using Plaintiffs' counsel's usual and customary hourly rates, the value of the 523.25 hours incurred through the date of the entry of the Court's Preliminary Approval Order on June 23, 2016 is $291,186.00. Plaintiffs' requested fees of $274,537.12 is slightly less than the amount computed at standard hourly rates and yields an implied average attorney rate of $524.68.

51. In support of their fee request, Plaintiffs offer no affidavits of North Carolina attorneys attesting to "the fees customarily charged in the locality for similar legal services," *see* N.C. Rev. R. Prof. Conduct 1.5(a)(3), and cite only to the National Law Journal's 2015 Billing Survey (the "NLJ Survey") as evidentiary support for its contention that the requested fees imply "rates commensurate with or below those typical and customary in North Carolina for similar litigation." (Pls.' Mem. Supp. Mot. Att'y Fees 9.) In particular, Plaintiffs contend, based on the NLJ Survey, that "North Carolina attorneys involved in complex commercial litigation typically charge as much as $675 per hour for their services." (Pls.' Mem. Supp. Mot. App. Att'y Fees 8–9.) The NLJ Survey, however, reports that North Carolina attorneys charge a widely varying range of hourly rates, spanning from $250 to $675 for partners and from $150 to $435 for associates, and the NLJ Survey does not report the specific range of hourly rates customarily charged in North Carolina for legal services of the sort Plaintiffs' counsel provided here.

52. The Court finds more relevant and persuasive for current purposes the affidavits attached to motions for attorneys' fees recently tendered by North Carolina attorneys in similar litigation. Although Plaintiffs did not offer any such affidavits in support of their motion here, the Court notes that North Carolina attorneys with extensive relevant experience in class action merger litigation did tender affidavits in three recent cases stating that typical fees charged in North Carolina for handling complex commercial litigation range from $250 to $450 per hour. *See In re PokerTek Merger Litig.*, 2015 NCBC LEXIS 10, at *23 (affidavit of John Hughes); *In re Harris Teeter Merger Litig.*, 2014 NCBC LEXIS 47, at *24 (same); *In re Progress Energy S'holder Litig.*, 2011 NCBC LEXIS 45 (No. 11 CVS 739) (affidavit of Gregory Martin).

53. The Court also finds persuasive the conclusions of various courts concerning customary fees charged in North Carolina for complex commercial litigation. *See, e.g.*, *Corwin v. British Am. Tobacco PLC,* 2016 NCBC LEXIS 14, at *15 (concluding that fees yielding "an implied average hourly rate of $325.04" to be "reasonable, and clearly not an excessive rate"); *In re PokerTek Merger Litig.*, 2015 NCBC LEXIS 10, at *23 (concluding that fees "in the range of $250-$450 per hour" were "consistent with the Court's own experience" and finding "an average attorney rate of $226.83 per hour [to be] "reasonable and clearly not excessive"); *In re Harris Teeter Merger Litig.*, 2014 NCBC LEXIS 47, at *25 (concluding that "$321.91 per hour "fell within a reasonable range" and was "reasonable and clearly not an excessive rate" based on the "court's experience in other cases"); *see also Nakatsukasa v. Furiex Pharms. Inc.*, 2015 NCBC LEXIS 71, at *24 (N.C. Super. Ct. July 1, 2015) (finding "rates of

approximately $300–$550 per hour [as] typical of the fees charged for this type of work in Wake County, North Carolina"); *In re Progress Energy S'holder Litig.*, 2011 N.C. LEXIS 45, at *27 (concluding that an effective rate of $130 per hour was reasonable because "North Carolina attorneys involved in complex commercial litigation typically charge much higher hourly rates for their legal services").

54.     Also persuasive to the Court are the rates charged by North Carolina attorneys the Court has recently appointed to serve as receivers or as counsel for receivers in complicated commercial settings. *See, e.g.*, Order on Receiver's Fifth Application for Compensation and Reimbursement of Expenses of Receiver, *In re Southeastern Eye Center – Pending Matters,* No. 12 CVS 1648 (N.C. Super. Ct. September 26, 2016) (approving fees for receiver, an attorney, at $400 per hour and for Receiver's counsel at $250 per hour); Order Granting Plaintiff's Motion for Dissolution, Appointment of Receiver and Injunctive Relief at 4, *Pro-Tech Energy Solutions, LLC v. Praether Cooper,* No. 14 CVS 20452 (N.C. Super. Ct. July 30, 2015) (approving fees for receiver, an attorney, at $475 per hour); Order Appointing Receiver at 4, *Battles v. Bywater, LLC*, No. 14 CVS 1853 (N.C. Super. Ct. Dec. 11, 2014) (approving fees for co-receivers, two attorneys, at average rate of $225 per hour); Order on Receiver's Application to Retain and Employ Counsel, *Thomley v. King*, No. 14 CVS 17364 (N.C. Super. Ct. Nov. 3, 2014) (approving fees for receiver's counsel at average rate of $320 per hour).

55.     Based on the above, and based on the Court's own experience in similar cases, the Court finds that the average attorney rate of $524.68 requested by

Plaintiffs' counsel here is above the hourly rate customarily charged in North Carolina for similar services. The Court further finds that the nature of the work performed by Plaintiffs' counsel could have been performed fully by competent North Carolina counsel and that the demands of the Consolidated Action did not require Plaintiffs to retain counsel from outside North Carolina in order to prosecute the Consolidated Action. Each of these findings militates against approval of a Fee Payment in the full amount requested. *See generally GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 247, 752 S.E.2d 634, 657 (2013) ("find[ing] it unreasonable to force [losing opponent] to pay a fee that includes rates [$633.25 per hour for a partner and $500 per hour for an associate at a national law firm] double those billed in the community where the litigation took place for work that seemingly did not require such a premium").

56. Based on the above, the Court concludes that a typical and customary hourly rate charged in North Carolina for complex commercial litigation of the sort involved here ranges from $250 to $475.[9]

57. The Court next considers the results obtained for the shareholders through this litigation. N.C. Rev. R. Prof. Conduct 1.5(a)(4). It is clear that Plaintiffs' efforts caused NewBridge to make additional, agreed-upon disclosures concerning certain

---

[9] The Court recognizes that the hourly rates currently charged by certain individual North Carolina lawyers fall outside this stated range, typically because of a particular attorney's extensive or limited experience or special or limited expertise, and notes that the Court may find it appropriate to address such considerations in determining a final fee award in a particular case. The Court further recognizes that the hourly rates charged by attorneys have historically increased over time, potentially limiting the usefulness of the Court's conclusion in considering future fee petitions.

matters, which were disseminated to shareholders through a Form 8-K filed with the SEC on February 5, 2016. (Pls.' Mem. Supp. Settlement Approval, Ex. 1, Stipulation and Agreement of Compromise, Settlement and Release ¶ 1.) Indeed, NewBridge, without admitting any wrongdoing, acknowledges that Plaintiffs' efforts "were the sole cause of the decision to file the Supplemental Disclosures." (Pls.' Mem. Supp. Settlement Approval, Ex. 1, Stipulation and Agreement of Compromise, Settlement and Release ¶ 1.)

58. The significance of the results obtained by Plaintiffs, however, depends heavily upon the materiality of the Supplemental Disclosures. Our Court of Appeals has considered the materiality of disclosures to shareholders in the merger transaction context and held as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills [v. Elec. Auto-Lite Co.,* 396 U.S. 375, 90 S. Ct. 616, 24 L. Ed. 2d 593] general description of materiality as a requirement that "the defect have a significant propensity to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Ehrenhaus I*, 216 N.C. App. at 88, 717 S.E.2d at 28–29 (quoting *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del. 1985)); *see PokerTek*, 2015 NCBC LEXIS 10, at *17 (citing cases from the Delaware Chancery Court to support its conclusion that certain

supplemental disclosures may be recognized as material); *see generally In re Trulia, Inc.*, 129 A.3d at 894 (stating that supplemental disclosures must "address a plainly material misrepresentation or omission" to survive judicial scrutiny).

59. The Supplemental Disclosures here can be classified into two categories— "information relating to potential conflicts of interest" and "information relating to Sandler O'Neill's valuation analyses that were performed, and reviewed by the Board, to support the fairness of the Merger considerations." (Pls.' Mem. Supp. Settlement Approval 13, 18.)

60. Regarding the "conflict of interest" disclosures, the Supplemental Disclosures included additional information about (i) the timing of post-merger employment and compensation discussions between Yadkin and Ridgill, NewBridge's President, CEO, and director; (ii) Sandler O'Neill's representation of NewBridge in its acquisition of Premier Commercial Bank and the specific compensation Sandler O'Neill received in representing VantageSouth Bancshares, Inc. in its sale to Yadkin; and (iii) the timing of NewBridge's discussions with Yadkin about the number of NewBridge seats on the Yadkin post-merger board. (Pls.' Mem. Supp. Settlement Approval 13, 16.)

61. As to the Sandler O'Neill valuation analyses, the Supplemental Disclosures provided shareholders (i) a "contribution analysis" Sandler O'Neill had performed but NewBridge had not disclosed in the Proxy, and (ii) various individual multiples and financial metrics underlying Sandler O'Neill's comparable company analyses of

NewBridge and Yadkin and its analysis of selected regional and nationwide merger transactions.

62. As an initial matter, the Court concludes that the disclosure of Sandler O'Neill's contribution analysis was at least of arguable materiality to the upcoming shareholder vote and potentially could have significantly altered the total mix of information made available to shareholders. "[S]tockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely." *In re Pure Res. S'holders Litig.*, 808 A.2d 421, 448–49 (Del. Ch. 2002) (enjoining the vote where no substantive portion of the investment bankers' work was disclosed). Nevertheless, a "fair summary . . . is a summary," and "[b]y definition, it need not contain all information underlying the financial advisor's opinion or contained in its report to the board . . . but rather an accurate description of the advisor's methodology and key assumptions." *In re Trulia, Inc.*, 129 A.3d at 900–01.

63. Here, the contribution analysis analyzed the standalone contribution of Yadkin and NewBridge to various balance sheet and income statement items and permitted the NewBridge Board to compare whether the proposed transaction fairly reflected NewBridge's results when compared to Yadkin's and thus whether the proposed transaction was fair to NewBridge's shareholders. Given the disclosure of the contribution analysis performed by Yadkin's investment advisor in the Proxy, the Court concludes that the Supplemental Disclosure of Sandler O'Neill's contribution analysis was of at least arguable materiality here.

64.     The Court is less persuaded, however, of the potential materiality of the other Supplemental Disclosures. For example, given that the Proxy informed shareholders that as of August 26, 2015, Yadkin's Letter of Intent included a term about Ridgill's ongoing role in the combined company, (Proxy 49), and set forth the date when his consulting agreement was reached and provided exacting detail regarding the final employment and compensation terms for Ridgill in the combined company should the proposed transaction be approved, (Proxy 79), the Court finds the Supplemental Disclosures offering further details as to timing of discussions concerning Ridgill's proposed employment less important and not material here. *See In re Atheros Commc'ns, Inc. S'holder Litig.*, No. 6124-VCN, 2011 Del. Ch. LEXIS 36, at \*42 (Del. Ch. Mar. 4, 2011) ("[T]he date on which Barratt learned from Qualcomm that it intended to employ him after the Transaction closed should be disclosed. If that additional disclosure is made, the date on which particular terms of Barratt's employment were first discussed will be rendered less important in light of the Proxy Statement's current disclosures that the terms themselves had been formally negotiated beginning on December 14, 2010, more than three weeks before the Merger Agreement was executed on January 5, 2011."); *Parsons v. Digital River, Inc.*, No. 10370-VCG, 2015 Del. Ch. LEXIS 10, at \*4–7 (Del. Ch. Jan. 12, 2015) (finding the disclosure that the acquirer was likely to retain senior management "gives stockholders the ability to consider management's incentives and provides all information likely to be material to stockholders"); *see generally Dent v. Ramtron Int'l Corp.*, No. 7950-VCP, 2014 Del. Ch. LEXIS 110, at \*47 (Del. Ch. June 30, 2014)

(noting plaintiff's "challenges to the adequacy of the summary of key events leading up to the . . . transaction are premised on the fallacy that this Court has long recognized and long rejected — *i.e.*, that increasingly detailed disclosure is always material and beneficial disclosure.")

65. In addition, the Court finds the Supplemental Disclosure identifying Premier Commercial Bank as the company Sandler O'Neill previously assisted NewBridge in acquiring when the Proxy disclosed that "[i]n the two years preceding the date of its opinion, Sandler O'Neill provided certain other investment banking services for NewBridge and received fees of $103,904 for such services," (Proxy 65), is less important and not material. The Court reaches the same conclusion concerning the Supplemental Disclosure adding the specific amount of financial consideration received when the Proxy disclosed that "Sandler O'Neill also acted as financial advisor to VantageSouth Bancshares, Inc. in connection with its sale to Yadkin Financial Corporation, which transaction closed on July 4, 2014." (Proxy 65.) While it is certainly true that shareholders often "place heavy weight upon the opinion of [financial advisors]", and that Delaware courts have "stressed the importance of disclosure of potential conflicts of interest of financial advisors," *In re John Q. Hammons Hotels Inc. S'holder Litig.*, No. 758-CC, 2009 Del. Ch. LEXIS 174, at *55-56 (Del. Ch. Oct. 2, 2009), the Supplemental Disclosures here did not identify a conflict of interest not otherwise disclosed in the Proxy, and the Court concludes that in the present circumstances they could constitute, at most, helpful, but not material, information, *see generally Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del.

2000) (observing that "[o]mitted facts are not material simply because they might be helpful"); *see also  David P. Simonetti Rollover IRA v. Margolis*, No. 3694-VCN, 2008 Del. Ch. LEXIS 78, at *19, 21–22 (Del. Ch. June 27, 2008) ("No further disclosures on this point would have altered the total mix of information available, *viz.*, that the same investment bank had represented parties with opposed interests in the Merger in temporal proximity.").

66.    Likewise, the Court finds that in light of the Proxy's disclosure of the reservation of Yadkin board seats for five NewBridge directors, their compensation, and the fact that "NewBridge and Yadkin had not yet identified which of the current NewBridge directors will join the board of Yadkin and Yadkin Bank upon completion of the merger," (Proxy 12), the Supplemental Disclosure that the number of NewBridge directors increased from four in the August 26, 2015 Letter of Intent to five in the September 4, 2015 Revised Letter of Intent, is also in the nature of potentially helpful information, but not information that would alter the total mix of information available to stockholders. *See, e.g., Parsons,* 2015 Del. Ch. LEXIS 10, at *4–7; *see also Matador Capital Mgmt. Corp. v. BRC Holdings*, 729 A.2d 280, 295 (Del. Ch. 1998) (holding that "a blow-by-blow description of events leading up to the proposed transaction" is not required); *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *14 (Del. Ch. Nov. 30, 1997) ("a full and fair characterization [of background to a transaction] does not require . . .  a 'play-by-play description of merger negotiations.'").

67. Finally, given that the Proxy contained comparable public company analyses and comparable public company transactions analyses, which listed all the companies and transactions, respectively, included in the respective peer group, their selection criteria, and the peer group's resulting median, mean, high and low, (Proxy 59–62), the Court finds the Supplemental Disclosures of the individual financial metrics of the companies and transactions included in the peer groups to be, at most, potentially helpful but not material information. *See e.g., In re Trulia, Inc.*, 129 A.3d at 904 ("The addition of the individual multiples and the revelation that some were not publicly available could not reasonably have been expected to significantly alter the total mix of information."); *In re Celera Corp. S'holder Litig.*, No. 6304-VCP, 2012 Del. Ch. LEXIS 66, at *121–22 (Del. Ch. Mar. 23, 2012), *rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012) (finding the supplemental disclosure of "charts of illustrative ranges of the various market multiples" of the financial advisor's "Selected Companies and Selected Transactions Analyses . . . did not . . . add[] important information" and concluding that because the "supplemental charts compiled information that already was publicly available . . . it is questionable whether they altered the "total mix" of available information" but "[n]evertheless . . . [finding the disclosures] to be compensable"); *In re Mony Group Inc. S'holder Litig.*, 852 A.2d 9, 27–28 (Del. Ch. 2004) (finding the nondisclosure of the investment bank's alternative grouping of companies in its comparative analysis that it included in the appendix of its report to the board trivial as the summary presented in the proxy was fair); *Dent*, 2014 Del. Ch. LEXIS 110, at *35–36 (finding no disclosure violation where

valuation multiples of each individual transaction and each individual company in advisor's selected transaction and selected company analyses were omitted, noting that "additional granularity . . . is [nothing] more than helpful or cumulative to the information already disclosed"); *In re Vitalink Communications Corp. S'holders Litig*, No. 12085, 1991 Del. Ch. LEXIS 195, at \*42–43 (Del. Ch. Nov. 8, 1991) (holding that the "comparable company analysis falls outside of this line of materiality" where the court "was not persuaded that disclosure of this analysis would have changed the total mix of information").

68. Based on the above, the Court concludes that, collectively, the Supplemental Disclosures were of only marginal benefit to the Class, a finding which is supported by the lack of substantial evidence that any of the Supplemental Disclosures were significant to a reasonable shareholder's decision in voting on the Proposed Transaction. The Court's conclusion militates against approval of a Fee Payment in the full amount requested, and does not justify the recovery of fees calculated at Plaintiffs' counsel's normal hourly billing rates. This conclusion also leads the Court to conclude that a fair and reasonable award of attorneys' fees in these circumstances should reflect the lower end of the range of hourly rates charged by North Carolina attorneys in complex business litigation.

69. The Court has carefully weighed and considered each of the Rule 1.5 factors, and, in the exercise of its discretion, concludes that the Plaintiffs' requested amount of attorneys' fees of $274,537.12 is not fair and reasonable, but rather excessive, based on the circumstances of this case and the record before the Court. Nevertheless, after

due consideration of each of the Rule 1.5 factors as applied to the circumstances of this case, the consideration of the give and the get of the Settlement, and the record before the Court, the Court concludes and determines, in the exercise of its discretion, that an award for Plaintiffs' attorneys' fees in this action of $135,000 is fair and reasonable and consistent with Rule 1.5 of the Revised Rules of Professional Conduct of the North Carolina State Bar.

70. The Court observes that the Court's award yields an implied average hourly rate of $258.00. Although the Court recognizes that this hourly rate is far below most of Plaintiffs' counsel's regular hourly rates and the hourly rate Plaintiffs' counsel has requested in its Motion for Attorneys' Fees, the Court finds that this hourly rate is within the range that North Carolina courts have routinely found to be reasonable for complex business litigation in North Carolina, *see supra* paragraphs 52—56, and is fair, reasonable, and appropriate under the circumstances of this case.

71. The Court further concludes that the Court's aggregate award is reasonable and within the range of awards that this Court has found to be reasonable in disclosure-based settlements of the sort at issue here. *See, e.g.*, *In re PokerTek Merger Litig.*, 2015 NCBC LEXIS 10, at *32 (awarding an aggregate award of $140,000).[10]

---

[10] Plaintiffs argue in the alternative that they are entitled to the requested attorneys' fees based on *quantum meruit* and under N.C. Gen Stat. § 55-7-46, which permits the Court to "order the corporation to pay the plaintiff's reasonable expenses, including attorneys' fees, incurred in the proceeding if it finds that the proceedings have resulted in a substantial benefit to the corporation." Given that the Court has concluded that the Supplemental Disclosures were of only marginal benefit to the Class, the Court denies Plaintiffs' motion for an award of additional attorneys' fees under either a *quantum meruit* analysis or under N.C. Gen. Stat. § 55-7-46.

72.    Accordingly, Plaintiffs' counsel for the Class are hereby awarded attorneys' fees in the amount of $135,000 and expenses in the amount of $25,462.88 which amount the Court finds to be fair and reasonable, not excessive, consistent with Rule 1.5 of the Revised Rules of Professional Conduct of the North Carolina State Bar, and which shall be paid to Plaintiffs' counsel by NewBridge, its successor, or on its behalf.

73.    **WHEREFORE**, the Court hereby:

a. **GRANTS** the Motion for Settlement Approval and **APPROVES** the Settlement;

b. **CERTIFIES** the Class as defined herein for purposes of the Settlement only;

c. **GRANTS** in part the Motion for Attorneys' Fees;

d. **AWARDS** the requested attorneys' fees in the amount of $135,000;

e. **AWARDS** the requested expenses in the amount of $25,462.88; and

f. **ENTERS FINAL JUDGMENT** consistent herewith.

**SO ORDERED**, this the 22nd day of November, 2016.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases